**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| VIVIAN MCDOUGALD, Administratrix, Ad Prosequendum, and Individually, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 12-3423 (MAS)(TJB) |
| FRANKLIN TOWNSHIP, *et al.*, | : | **MEMORANDUM OPINION** |
| Defendants. | : | |

**SHIPP, District Judge**

On August 10, 2010, Arthur McDougald ("Mr. McDougald") was shot and killed in front of his house by an officer of the Franklin Township Police Department. His wife, Plaintiff Vivian McDougald ("Mrs. McDougald") commenced this civil rights action individually and on behalf of her late husband. In bringing this action, Mrs. McDougald is joined by Mr. McDougald's family members, Plaintiffs Shyron Jackson, Timothy McDougald, Diallobe and Kavita McDougald (collectively, "Plaintiffs"),[1] who bring claims for wrongful death and loss of consortium.

Presently before the Court is the motion of Defendants Franklin Township (the "Township"), Franklin Township Police Department ("FTPD"), Corporal Michael Price, Corporal David McNamara, and Sergeant Edward Stout (collectively, "Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Defs.' Br., ECF No. 15-1.) Plaintiffs filed Opposition (Pls.' Opp'n, ECF No. 20-3) and Defendants replied (Defs.' Reply, ECF No. 22). The Court has carefully considered the Parties' submissions and decided the matter without oral argument

---

[1] Because many of the Plaintiffs share the same surname, the Court will sacrifice formality for clarity and refer to Mr. McDougald's family members by their first names.

pursuant to Local Civil Rule 78.1. For the reasons set forth below, and other good cause shown, Defendants' Motion for Summary Judgment is GRANTED.

## I.      BACKGROUND

### A.      The Events of August 10, 2010

The following is a summary of the facts relevant to the disposition of Plaintiffs' claims. As it must on a motion for summary judgment, the Court construes the evidence in the light most favorable to Plaintiffs, the non-moving parties in this case.

On the evening of August 10, 2010, Mr. and Mrs. McDougald's adult daughter, Kavita, arrived at her parents' home around 8:00 p.m. (8/10/10 K. McDougald Stmt. at 2, Ex. B, ECF No. 15-3.) When she arrived, her parents were standing in the kitchen having a verbal dispute about their family-owned daycare center. (8/10/10 V. McDougald Stmt. at 3, Ex. A., ECF No. 15-3; 911 Recording, Ex. K, ECF No. 15-4.) Apparently, a recently published local newspaper article featured Mrs. McDougald and the daycare center, but made no mention of Mr. McDougald. Mr. McDougald was upset about this, causing the argument to escalate throughout the evening. (V. McDougald Stmt. at 3-5, 15.) Evident from his behavior, Kavita noticed that her father was in a "mood" and acting strangely. Kavita had greeted her father, but he did not reciprocate. Instead, he continued to fuss as he went outside to the garage in the backyard. (K. McDougald Stmt. at 2-3.)

While outside, Mr. McDougald engaged in a telephone conversation, which was overheard by Mrs. McDougald and Kavita from inside the house. (K. McDougald Stmt. at 4.) Reacting, Mrs. McDougald went outside to speak with Mr. McDougald. (K. McDougald Stmt. at 5.) However, upon her attempt to speak with him, Mr. McDougald threw a milk crate towards her and the house. (V. McDougald Stmt. at 5-6; K. McDougald Stmt. at 5.) Escaping injury, Mrs. McDougald ran inside the house and locked the doors. (V. McDougald Stmt. at 5-6; K. McDougald Stmt. at 5.) She was afraid, so she told her daughter to call the police. (V. McDougald Stmt. at 17.)

2

Following her mother's orders, Kavita called 911, at approximately 8:45 p.m., for police response at her parents' home. On the call, Kavita stated that her father was screaming at her mother, had thrown a milk crate at her, and that her mother was scared. (Defs.' SMF ¶¶ 1-2, ECF No. 15-10; Pls.' Resp. ¶¶ 1-2, ECF No. 20-2.) She also told the operator that her parents did not have any weapons. (911 Recording, Ex. K.)

After approximately seven or eight minutes, Mrs. McDougald decided that it would be best to leave the home instead of waiting for the police to arrive; she proceeded to pack a bag. (V. McDougald Stmt. at 7.) Kavita called 911 to cancel the police response. On the call, she told the operator that she and her mother planned on leaving the premises and that her mother wanted a restraining order. The operator told her that she could not cancel the police response. The operator explained that the police were already en route to their home so she should stay and wait, and that Mrs. McDougald could inquire about a restraining order with the police officers upon their arrival. (911 Recording, Ex. K.)

In response to Kavita's initial 911 call, Corporals McNamara, Price, and Sergeant Stout were dispatched to respond to a domestic disturbance at the McDougald home. (8/18/10 Price Stmt. at 2, Ex. B, ECF No. 15-4; Compl., ECF No. 1, ¶ 10.) Although this was their first response to the McDougald home that night, these officers had been dispatched to the McDougald residence on prior occasions. (V. McDougald Stmt. at 7; Price Stmt. at 6; 8/18/10 Stout Stmt. at 6, Ex. A, ECF No. 15-4; 8/18/10 McNamara Stmt. at 3, Ex. C, ECF No. 15-4.) Around 8:57 p.m., the three officers arrived at the McDougald residence. (Defs.' SMF ¶ 4; Pls.' Resp. ¶ 4.) At this point, Mr. McDougald was sitting outside by the garage. (McNamara Stmt. at 3.) Corporal McNamara and Sergeant Stout remained outside to speak with Mr. McDougald. (Defs.' SMF ¶ 5; Pls.' Resp. ¶ 5.) Mr. McDougald recounted the argument with his wife and told Corporal McNamara that he had thrown a milk crate. (McNamara Stmt. at 4.)

3

Meanwhile, Corporal Price entered the rear of the residence to speak with Mrs. McDougald. (Defs.' SMF ¶ 5; Pls.' Resp. ¶ 5.) Mrs. McDougald was upset and asked Corporal Price for a restraining order against Mr. McDougald to prohibit him from coming to their daycare center. (Price Stmt. at 3; V. McDougald Dep. Vol. I 84:10-25, Ex. A, ECF No. 15-6.) She told Corporal Price that Mr. McDougald did not hit or threaten her, but that she was tired of his nagging. (V. McDougald Dep. Vol. I 83:24-84:9.) Corporal Price gave Mrs. McDougald the restraining order forms to fill out and advised her of her rights. She began filling out the forms and Corporal Price left the house. (V. McDougald Stmt. at 8.)

Corporal Price joined Corporal McNamara and Sergeant Stout outside and told them "95"— the code to effectuate an "arrest." (Stout Stmt. at 2; Price Stmt. at 3; McNamara Stmt. at 5; McNamara Dep. 40:4-10, Ex. F, ECF No. 15-8.) Corporal Price then informed Mr. McDougald that he was under arrest for domestic violence and that his wife was seeking a restraining order. (Price Stmt. at 3, 8-9; McNamara Stmt. at 6.) Mr. McDougald cooperated and proceeded to empty his pockets. Then, as the officers prepared to handcuff him, he broke away and sprinted towards the front of his house via the driveway abutting his home. (Stout Stmt. at 2; Price Stmt. at 4; McNamara Stmt. at 6; McNamara Dep. 44:24-45:9.)

All three officers gave chase: Corporal McNamara was directly behind Mr. McDougald and Corporal Price was behind him. (McNamara Stmt. at 6; McNamara Dep. 45:5-9.) Sergeant Stout trailed behind as he attempted to contact headquarters via his police radio. (Stout Stmt. at 3.) Approaching the front corner of the house, Mr. McDougald turned left and lost his footing, causing him to fall to the ground. (Stout Stmt. at 2; Price Stmt. at 4.) Hot on his heels, Corporal McNamara immediately wrapped his left arm around Mr. McDougald's waist as he hit the ground. (McNamara Stmt. at 7, 9; McNamara Dep. 55:24-56:7.) While Corporal McNamara and Mr. McDougald were on the ground, Corporal Price kneeled to the right of Corporal McNamara to try to assist with the arrest. (Price Stmt. at 4.)

4

During the scuffle, Mr. McDougald reached for his right ankle. (Price Stmt. at 4; McNamara Dep. 55:24-56:7, 66:18-67:9.) Sticking out of Mr. McDougald's right sock was a black handle. Corporal McNamara thought the handle was a folding knife, so he immediately cried out, "knife, knife," to the other two officers. (McNamara Stmt. at 7; Stout Stmt. at 2; Price Stmt. at 4; McNamara Dep. 56:17-24.) Mr. McDougald grabbed his weapon and began to raise it from his ankle; it opened like a switchblade. (McNamara Stmt. at 7.) At this moment, Corporal McNamara realized Mr. McDougald's weapon was not a knife, but a small silver revolver. (McNamara Stmt. at 7.) Attempting to grab the gun with his right hand, Corporal McNamara immediately yelled, "It's a gun, it's a gun. I don't have it, he's got it." (McNamara Stmt. at 8; Stout Stmt. at 2; Price Stmt. at 4; Price Dep. 59:8-23, Ex. G, ECF No. 15-9.)

Mr. McDougald continued to raise the gun towards the officers. (Price Stmt. at 4; Price Dep. 59:8-60:2.) Approximately six inches away from Mr. McDougald, Corporal Price immediately leaned to the right to avoid being shot. He quickly drew his gun, firing one shot to the left side of Mr. McDougald's head, killing him. (Price Stmt. at 4; Price Dep. 59:8-60:6.) Mr. McDougald's body went limp. (McNamara Stmt. at 8.) Corporal McNamara removed the gun from Mr. McDougald's possession. Upon realizing that it was Mr. McDougald—and not him—who was shot, he laid Mr. McDougald on his back to assess him. Mr. McDougald had no pulse and was not breathing, so Corporal McNamara started performing CPR. (McNamara Stmt. at 8.) Mrs. McDougald exited her home and saw CPR being performed on her husband. She told the officers that she knew CPR, but was directed to stay inside the house. (V. McDougald Dep. Vol. I 88:4-10.) Immediately thereafter, at approximately 9:09 p.m., Sergeant Stout ran back to his patrol car, retrieved his medical bag, and telephoned for medical assistance. (Stout Stmt. at 2-3; Stout Patrol Vehicle Video, Ex. J, ECF No. 15-4.)

Mrs. McDougald and Kavita were inside of the house and did not see the shooting. Both women, however, heard the fatal gun shot.[2] (V. McDougald Stmt. at 8-9; K. McDougald Stmt. at 8-9.) After the shooting, police informed Mrs. McDougald that her husband had a gun. She speculated that the "gun was meant for [her] and [her] daughter." (V. McDougald Stmt. at 17; *see also id.* at 9-10.)

### B.     The Complaint

Plaintiffs filed their Complaint in the Superior Court of New Jersey, Somerset County, on December 22, 2011. On June 6, 2012, the case was removed to this Court. (Notice of Removal, ECF No. 1.) Count One of the Complaint contains state law claims for assault, battery, and negligence based on the officers' alleged excessive force. Count Two alleges violations of the Fourth, Eighth, and Fourteenth Amendments, under 42 U.S.C. § 1983, against Franklin Township and the FTPD for negligent hiring, training, discipline and supervision in the use of deadly force. Count Three also invokes § 1983, but the claim is directed at the officers for violations of the Fourth and Fourteenth Amendments. Count Four alleges violations of the Fourth, Eighth and Fourteenth Amendments, claiming that the officers conspired to violate Mr. McDougald's civil rights by using excessive force. Count Five is similar to Plaintiffs' § 1983 claims, except the claim is predicated on violations of the New Jersey Civil Rights Act ("NJCRA") and the New Jersey Constitution. Lastly, Count Six contains loss of consortium claims brought by Mrs. McDougald and her adult children.

### II.     STANDARD OF REVIEW

Summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A district court considers the facts drawn from the "materials in the record, including depositions, documents, electronically stored information, affidavits . . . or other materials" and must "view the

---

[2] Shyron and Timothy were not at the McDougald residence at the time of the shooting. (T. McDougald Dep. 36:13-20, Ex. C, ECF No. 15-7; Jackson Dep. 20:7-21:8, Ex. D, ECF No. 15-8.)

inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c)(1)(A); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the non-moving party. *Id.* at 248-49. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

## III.   DISCUSSION

After a careful review of the record in this tragic case, the Court is convinced that no rational fact-finder could conclude that Corporal Price's decision to use deadly force was unlawful. Defendants are therefore entitled to summary judgment on each of Plaintiffs' claims.

### A.   Corporal Price Acted Reasonably

The constitutional inquiry into a police officer's use of force to apprehend or subdue a free citizen centers on "reasonableness." *Graham v. Connor*, 490 U.S. 386, 397 (1989).[3] The Fourth Amendment demands that an officer's decision to apply force be "objectively reasonable in light of the facts and circumstances" confronting the officer at the time. *Id.* The use of deadly force is reasonable when "the officer has good reason to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

Defendants assert that the decision to use deadly force was reasonable in light of the facts available to Corporal Price at the moment he fired at Mr. McDougald. (Defs.' Br. 12-17.) The record

---

[3] Excessive force claims brought pursuant to § 1983 must be analyzed under the Fourth Amendment. *Graham*, 490 U.S. at 398.

7

supports this position. It is undisputed that when the officers tried to place Mr. McDougald under arrest, he attempted to evade arrest by running away. After losing his footing, he drew his gun within inches of Corporal McNamara's face and towards the other two officers, at which point Corporal Price fired one shot. Based on these circumstances, a reasonable officer in Corporal Price's position would perceive Mr. McDougald as a mortal threat to Corporal McNamara, Sergeant Stout, and himself. *Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004) ("A reasonable officer should not be expected to take the risk of being assaulted by a fleeing man who was so close that he could grapple with him and seize the gun.").

Plaintiffs resist this conclusion on two grounds. Examining each of Plaintiffs' arguments in turn, the Court finds them unavailing. First, Plaintiffs argue that the officers created the dangerous situation when they attempted to arrest Mr. McDougald without probable cause.[4] (Pls.' Opp'n 8-9, 12.) As Plaintiffs see it, the McDougalds' loud argument was nothing more than "domestic [contretemps],"[5] where neither Mrs. McDougald nor Kavita were injured or threatened by Mr. McDougald. (*Id.* at 9-10.) In other words, but for the officers arresting Mr. McDougald without probable cause, the shooting death would not have occurred. (*See id.* at 12.) This position is specious. Even assuming the officers lacked probable cause to arrest Mr. McDougald, their attempt to arrest him was not a proximate cause of Mr. McDougald's death. *See Lamont*, 637 F.3d at 185 ("a § 1983 plaintiff must establish both causation in fact and proximate cause"). Rather, Mr. McDougald's decision to aim a gun within inches of the officers was the "superseding cause that broke the causal chain between [the officers' attempted arrest] and the shooting." *Id.* at 186.

Plaintiffs' second argument focuses on the officers' supposed failure to use non-lethal alternatives in violation of the Attorney General's "Use of Force" guidelines. (Pls.' Opp'n 13-14.)

---

[4] The Court notes that Plaintiffs have not brought a claim pursuant to § 1983 for false arrest on the part of the Defendant Officers.

[5] Plaintiffs quote *Corrente v. Corrente*, 281 N.J. Super. 243, 250 (App. Div. 1995), but mistakenly quoted the court as saying "domestic contrapments" instead of "domestic contretemps."

According to Plaintiffs, reasonable officers would have directed one of the parties to leave the premises to diffuse the situation, which would have avoided the "drama" and subsequent shooting. (*Id.* at 14-15, n.2.) The basis for Plaintiffs' second argument, which appears to be a reiteration of the first, is that "the true analysis of this case is not at the point when Price fire[d] his weapon . . . but all those errors that precipitated that extreme act." (*Id.* at 14-15.) The Court cannot accept this reasoning.

As an initial matter, Plaintiffs' assertion—without the benefit of case law—focuses on the wrong inquiry. The Court is required to determine whether Corporal Price had probable cause to believe that Mr. McDougald posed an immediate threat of serious physical harm to himself and his fellow officers. *Garner*, 471 U.S. at 3. The Court finds that, under the circumstances, he did. The Court "decline[s] to second-guess whether alternative actions by police officers 'might conceivably have been available.'" *Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (citation omitted). Moreover, Plaintiffs' argument ignores the fact that arresting Mr. McDougald would have accomplished their proposed alternative—removing Mr. McDougald from the premises for a "cooling off" period. *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 392 (2000) (noting, with approval, that "the arrest . . . was effectuated for the principal purpose of removing the alleged perpetrator from the victim's presence and to allow the parties time to cool off").[6]

Viewing the evidence in the light most favorable to Plaintiffs, no rational fact-finder could conclude that Corporal Price's decision to fire on Mr. McDougald was unreasonable. Corporal Price is therefore entitled to summary judgment on Count 3 of the Complaint.

---

[6] Plaintiffs hint that the McDougald's acrimonious relationship with these three officers should be considered in analyzing Corporal Price's conduct. (Pls.' Opp'n 14 n.2.) The record shows that the officers have previously responded to domestic violence calls at the McDougald residence. However, "the question of whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them [is] without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 398.

**B.**      **Sergeant Stout's and Corporal McNamara's Liability**

Plaintiffs' claims against Corporal McNamara and Sergeant Stout, who did not fire their weapons during the encounter with Mr. McDougald, can only be premised on their duty to prevent Corporal Price from using unlawful force to subdue Mr. McDougald. *See Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). Because Corporal Price's decision to use deadly force was reasonable, however, Corporal McNamara and Sergeant Stout cannot be liable on a failure to intervene theory. *See id.*; *Nifas v. Coleman*, 525 F. App'x 132, 135-36 (3d Cir. 2013) (plaintiff who fails to establish constitutional violation "also cannot succeed on his failure to intervene claim"). It follows that both Corporal McNamara and Sergeant Stout, too, are entitled to summary judgment on Count 3.

**C.**      **Remaining Defendants' § 1983 Liability**

Similar reasoning applies to Plaintiffs' civil rights claim against the Township and the FTPD. In the absence of a constitutional violation, there can be no municipal liability under § 1983. *See Brown v. Pa. Dept. of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights"). In light of the Court's findings with respect to the officers, the Township and the FTPD are entitled to summary judgment on Count 2 of the Complaint.

**D.**      **Plaintiffs' NJCRA and New Jersey Constitutional Claim**

"The [NJCRA] is a state law corollary to 42 U.S.C. § 1983—it creates a private right of action for the violation of civil rights secured under the New Jersey Constitution." *Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010); *cf.* N.J. Stat. Ann. § 10:6-2(c). For the reasons set forth in the preceding discussion of § 1983, Defendants are also entitled to summary judgment as to Count 5. *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011).

10

### E.     Plaintiffs' § 1986 and § 1988 Claims

Plaintiffs do not dispute that their § 1986 claim is barred as untimely. Any claim pursuant to § 1986 must be brought "within one year after the cause of action has accrued." 42 U.S.C. § 1986. Plaintiffs brought this action on December 11, 2011, more than one year after Mr. McDougald's death on August 10, 2010.

In addition, "[42 U.S.C. §] 1988 does not create an independent cause of action. Rather, it "defines procedures under which remedies may be sought in civil rights actions." *Thomas v. East Orange Bd. of Educ.*, No. 2:12–01446(WJM), 2014 WL 495133, at *8 (D.N.J. Feb. 6, 2014) (citation omitted).

Accordingly, Defendants are entitled to summary judgment as to Count 4.

### F.     State Law Claims

As Defendants correctly assert, because the Court has determined that the actions of the officers were reasonable, Plaintiffs' state law claims for assault, battery, and negligence based on excessive force cannot survive summary judgment. *Wildoner*, 162 N.J. at 387 ("The same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the [New Jersey] Torts Claims Act, N.J. [Stat. Ann.] 59:9-3.") Defendants are entitled to summary judgment as to Count 1.

### G.     Mrs. McDougald's Loss of Consortium Claim

Plaintiffs do not oppose summary judgment as to the adult children's loss of consortium claims. (*See* Pls.' Opp'n 19.) In any event, because Plaintiffs' claims cannot survive summary judgment, Mrs. McDougald's derivative loss of consortium claim cannot either.

Therefore, summary judgment is granted as to Count 6.

11

IV.   **CONCLUSION**

     For the reasons set forth above, and for other good cause shown, it is hereby ordered that

Defendants' motion is granted. An appropriate Order follows.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: April <u>30th</u>, 2014